Henry Dourif v. Commissioner.
Dourif v. Commissioner
Docket No. 110376.
United States Tax Court
1943 Tax Ct. Memo LEXIS 89; 2 T.C.M. (CCH) 909; T.C.M. (RIA) 43453; October 9, 1943
*89 Selden S. McNeer, Esq., and Robert L. Baughan, C.P.A., First Huntington Nat. Bank Bldg., Huntington, W. Va., for the petitioner. Philip A. Bayer, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding involves income tax deficiencies for 1936, 1938, and 1939 in the respective amounts of $2,109.54, $2,928.67, and $2,325.08. The only question in issue is whether the petitioner is entitled in each of the taxable years to the deduction of amounts which he claims to have paid as interest on indebtedness to his wife. Findings of Fact Petitioner is a resident of Huntington, West Virginia. He filed his income tax returns for 1936, 1938, and 1939 with the collector of internal revenue for the district of West Virginia. Petitioner is a native of France. He came to the United States in 1909, a few years after his graduation from the Central School of Engineering in France. He first located at Tiffin, Ohio, where, with associates, he engaged in the manufacture of ultramarine. He had specialized in this field of his engineering studies. In 1912 the business was moved to Huntington, West Virginia, and a new plant was built. At about that time *90 petitioner and his associates organized the Standard Ultramarine Company. Petitioner became vice-president and technical director of the company. After the outbreak of the World War petitioner returned to France and served as an officer in the French Army. In 1918, while still in the military service, he was married in Paris, France, to Mlle. Renee Eveline Huillard, a French citizen. He returned to the United States in July, 1918, with his wife on a special mission for the French Government. He was demobilized in February, 1919, and soon thereafter took up his residence with his wife at Huntington, West Virginia. In 1935 he took out his first citizenship papers and was granted United States citizenship in 1941. Just prior to his marriage petitioner and his wife and her parents, in accordance with the French custom, entered into a formal marriage contract. This contract provided for payment by the parents of the wife "to the future spouses" of a dowry of 200,000 francs ($40,000) which was "in advancement of inheritance." The contract further provided that the future spouses intended - * * * to exclude from their community the property owned by them at the time of marriage and the *91 dowry hereinabove stated, together with all property which during the marriage either of them may acquire, both real estate and personal property, through inheritance, gifts, legacies or in other like manner. Therefore, the community will be composed only of property acquired during the marriage by the spouses, together or separately, and derive as well from their work (industre) as of the incomes and revenues of their own separate property. The contract further provided: ARTICLE NINTH PRECIPUT (Benefits stipulated in a marriage contract in favor of a surviving wife or husband) The survivor of the future spouses shall take as preciput, and before any division of the property (goods) of the community, such furniture belonging to the community which it pleases him or her to choose, up to the amount of ten thousand francs, based upon the valuation of the inventory which will be made at the dissolution of the community, or that sum in cash for all or part, at his or her choice. The survivor will have also the right to take all or part of the surplus of the furniture of the community, while crediting to the heirs of the first dying of the spouses its value, according to the *92 valuation of the inventory. The intended wife, if it is she who survives, will have the right to take the said preciput and to make use of the privilege accorded by this article, whether she accept the community or whether she renounce it. Mrs. Dourif's father died in 1929 and in 1930 and 1931 she received $61,687.99 from his estate. In 1932 she received a distribution of $6,005.39 from the estate of her mother who died during that year. She also received as a gift from her mother, made just prior to her mother's death, 792 shares of stock of the United Dyewood Corporation. All of these funds and properties were immediately turned over to the petitioner for investment and management. He invested some of them in shares of Standard Ultramarine Company, some in a securities trading account, and some in real estate. Mrs. Dourif had no business experience and was willing for her husband to handle the funds as he saw fit. A portion of the dowry was put into a home which petitioner and his wife built in Huntington in 1919 and 1920. The total cost of the home was about $90,000. The title to the property has at all times been in petitioner's name. The brokerage account referred to above was *93 first in petitioner's name, then in the joint names of petitioner and wife, and finally in the wife's name. Mrs. Dourif knew about the account but took no active part in its management. In 1924 petitioner transferred to Mrs. Dourif 50 shares of Standard Ultramarine Company stock at a valuation of $17,500. In April, 1935, Mrs. Dourif, upon petitioner's advice, took out a fifteen-year endowment insurance policy on her life in the amount of $60,000. Upon issuance the policy was by mistake made payable to petitioner but within 30 days the error was corrected and the children of petitioner and Mrs. Dourif were named beneficiaries, as was intended from the first. The annual premium on this policy amounting to $4,197 was paid by petitioner in each of the taxable years 1936, 1938, and 1939. Mrs. Dourif still retains her French citizenship. Since her marriage she has regularly spent about six months of each year in France. Petitioner also spends from three to five months in France each year. He owns an apartment in Paris and a large country place in central France. Up to and during the taxable years involved petitioner maintained a bank account with Morgan & Company in Paris and also accounts *94 with two smaller banks in France. He drew checks on his Morgan & Company account payable to his wife amounting in the aggregate to 46,000 francs ($2,300) in 1936. 87,000 francs ($2.900) in 1938. and 85,000 francs ($2,833.33) in 1939. These checks were all issued to Mrs. Dourif while she was visting in France and were for her own personal use. In 1938 petitioner engaged an accountant to audit his records and prepare a statement of the financial situation between him and Mrs. Dourif. This statement, which apparently was not completed until the close of 1941, shows on the credit side the dowry of $40,000 received in 1918; securities from Mrs. Dourif's father's estate some of which were sold in 1931 for $43,385.56, others for $8,064.12, and others in 1935 for $10,238.31; securities from the estate of Mrs. Dourif's mother which were sold by petitioner in 1932 for $6,005.39; and the 792 shares of United Dyewood Corporation stock received by gift from Mrs. Dourif's mother in 1932 sold by petitioner in 1935 for $12,545.78. On the debit side of the statement are shown transfers to Mrs. Dourif of 50 shares of Standard Ultramarine Company stock in 1924 at $17,500; 300 shares of three different *95 stocks in 1935 aggregating $12,482.50; 500 shares of three different stocks in 1936 aggregating $19,552.50; 30 shares of two different stocks in 1937 aggregating $1,140; 200 shares of two different stocks in 1938 aggregating $4,200; and a cash payment in 1941 of $3,013. The balance shown as due Mrs. Dourif at December 31, 1941, was $62,351.16. In his income tax returns for each of the years 1938 and 1939 petitioner claimed a deduction of $6,000 for interest paid to Mrs. Dourif. He claimed no such interest deduction in his returns for 1936, 1937, or 1940. Mrs. Dourif filed separate returns for 1938 and 1939 in which she reported interest received of $6,000 for each year. She reported no interest received in 1936, 1937, or 1940. Opinion A considerable portion of petitioner's brief is devoted to the question whether his and his wife's respective rights in the dowry and other property which were acquired from Mrs. Dourif's parents are to be determined by the laws of France or by the laws of the State of West Virginia. We will assume, in accordance with petitioner's contentions, that the State of West Virginia was the matrimonial domicile of petitioner and his wife; that the laws of *96 that state controlled the question of the property rights of the spouses (see Beale's Conflict of Laws, vol. 2, p. 1013); and that under those laws petitioner had no rights of ownership in the dowry or in any of the funds which Mrs. Dourif acquired from her father and mother or their estates. From that point petitioner argues that he used his wife's property in his own business; that he thus became indebted to her, under the laws of the State of West Virginia, for the amount of such property; that this indebtedness bore interest at the legal rate of six percent; and that he actually paid such interest, in part at least, to his wife by checks issued to her from time to time from his bank account and by the payment of the annual premium on her endowment insurance policy. With these latter contentions we can not agree. The property which was acquired from Mrs. Dourif's parents was all entrusted to petitioner for investment and management. Some of it petitioner invested in his ultramarine business, some in the securities account, and some in real estate. Petitioner's wife had had no business experience and was perfectly willing for petitioner to manage her properties for her. There *97 was never any agreement between petitioner and his wife that she would lend to him or that he would borrow from her any of her properties Petitioner testified in this proceeding that he agreed orally with Mrs. Dourif some time in 1935 that he should stand indebted to her for approximately $100,000 and thenceforth would pay her interest on that amount. He further testified that his payments on the premiums on the endowment insurance policy on Mrs. Dourif's life were intended as payments of interest and that this was in accordance with the oral agreement. Mrs. Dourif testified when asked about this agreement as follows: Q. Was there any agreement between the two of you as to the amount that he owed you, or the approximate amount? A. I don't remember. Q. Was there anything said about interest that he was to pay you? A. Yes. About interest? Q. Yes. A. I don't remember. Q. What was the insurance policy for? A. The insurance policy was the interest of the money that he owed me. Q. Who was going to pay the premiums on the insurance policy? A. He was. Q. And why was he going to pay the premiums? A. Well, he was paying me the interest. Q. That was a method of paying you the interest *98 - was that it? A. Yes. Q. And then was that all of the interest he was to pay you, or was he to pay you some more interest? A. He gave me a little more. * * * * *
Q. What was your understanding as to when that original interest would be paid to you? A. I don't remember. Q. Was he to pay it to you in this country or while you were in France, or did you have any understanding of that sort? A. I don't remember if there was an understanding but I did spend quite a little in France of that extra. It is clear from the evidence that there was never any definite agreement between petitioner and his wife that their funds should be kept separate. Apparently their properties were all commingled under the management of petitioner. We do not think that such an arrangement between a husband and wife can give rise to a debtorcreditor relationship upon which interest may be claimed as a deduction in the income tax returns of either. The deductions allowed by the statute are for "All interest paid or accrued within the taxable year on indebtedness." (Section 23(b), Internal Revenue Code.) To constitute an indebtedness within the meaning of the statute there must be a legally enforceable *99 obligation to pay not only the interest but the principal as well. See Paul Autenreith, 41 B.T.A. 319; affd., 115 Fed. (2d) 856; William Park, 38 B.T.A. 1118; affd., 113 Fed. (2d) 352; W. S. Gilman, 18 B.T.A.; affd., Gilman v. Commissioner, 53 Fed. (2d) 47. In Gilman v. Commissioner, supra, the court said: * * * The term "indebtedness" as used in the Revenue Act implies an unconditional obligation to pay. Any definition more fiexible would only encourage subterfuge and deception. * * * In Irene W. Johnson, 39 B.T.A. 702; affd., 108 Fed. (2d) 104, it was held that a taxpayer was not entitled to deduct payments made to her sisters under an oral agreement to pay them interest on funds obtained from the redemption of shares of stock which she claimed to have held as trustee for the sisters. In our opinion we said: * * * The "agreement" acknowledges that the petitioner and her personal representatives are indebted to herself as trustee "in the *100 sum of $52,500 for money borrowed," and continues: I do hereby promise and agree for myself, my heirs, executors, administrators and assigns to pay to the said Irene W. Johnson, as trustee, and her successor in interest, the sum of $2,625 per year interest upon said borrowed money for and during the natural life of [the sister concerned]. The feature which strikes the reader at once is the absence of any promise to pay the principal. Emil Weitzner, 12 B.T.A. 724. Yet the existence of a principal debt, not merely an obligation to pay "interest," is a prerequisite of the deduction. Edwin M. Klein, 31 B.T.A. 910, 918, 919. In both the letter and the acknowledgement there is a significant failure to include any promise to repay principal, not to mention the complete absence of a time for payment. The agreement to pay interest stands alone with no accompanying promise to repay the amount "borrowed." * * * The evidence here does not show that petitioner ever borrowed any of his wife's funds or ever promised to repay any of the principal amount on which the interest deductions are claimed. Petitioner argues that he is under *101 a legal obligation to repay all of his wife's separate funds because he used them in his own business and lost some of them through bad investments. The evidence is that some undisclosed portion of Mrs. Dourif's funds were invested in the brokerage account which sometimes stood in the joint names of petitioner and his wife and sometimes in the name of the wife alone. The losses from securities transactions in this account apparently were as much the losses of Mrs. Dourif as of the petitioner. This may also be true of the losses of some undisclosed portion of the funds in "Florida real estate," to which petitioner referred in his testimony. Some of Mrs. Dourif's funds, the amount not shown, were used in building the home in Huntington in which she and petitioner live. To whatever extent Mrs. Dourif's funds were invested in this property they were not used in petitioner's business or for his separate use and apparently Mrs. Dourif has a proportional equitable interest in the property. It is not necessary in our disposition of the question in issue to determine whether the payment by petitioner of the premiums on the insurance policy taken out on the life of Mrs. Dourif and the issuance *102 of the checks to Mrs. Dourif for her personal use could in any event be considered as payments of interest on an indebtedness. They might be, provided there was a valid indebtedness and an agreement that interest on the indebtedness was to be paid in this manner. In the absence of a valid indebtedness there was, of course, no deductible payment of interest. The evidence, we think, is insufficient to overcome the correctness of the respondent's determination that petitioner is not entitled to the interest deductions which he claimed in his returns for the taxable years 1936, 1938, and 1939. Decision will be entered for the respondent.